Filed 4/20/22; Certified for Partial Pub. 5/12/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| WE ADVOCATE THROUGH ENVIRONMENTAL REVIEW et al., | C090840 |
| Plaintiffs and Appellants, | (Super. Ct. No. SCCVCVPT201841) |
| v. | |
| COUNTY OF SISKIYOU et al., | |
| Defendants and Respondents; | |
| CRYSTAL GEYSER WATER COMPANY, | |
| Real Party in Interest and Respondent. | |

From 2001 to 2010, a water bottling company operated a plant in Siskiyou County (the County) that extracted groundwater and then used it to produce bottled water. A few years after the plant closed, Crystal Geyser Water Company (Crystal Geyser) bought the facility and sought to revive it. To that end, Crystal Geyser requested, among other

1

things, a permit from the County to build a caretaker's residence for the bottling plant and a permit from the City of Mount Shasta (the City) to allow the plant to discharge wastewater into the City's sewer system. Both the County and the City ultimately granted Crystal Geyser the permits it sought.

This appeal concerns one of two lawsuits challenging these approvals, both of which are now on appeal and both of which concern the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.). In one suit, Appellants We Advocate Thorough Environmental Review and Winnehem Wintu Tribe alleged that the County's environmental review for the bottling facility was inadequate under CEQA. In another, they alleged that the City's decision to issue the wastewater permit for the bottling plant, which relied on the County's environmental review for the facility, was also improper under CEQA.

We focus here on Appellants' challenge to the County's environmental review for the bottling facility. CEQA generally requires public agencies, like the County and the City, to consider the environmental consequences of discretionary projects they propose to approve. When multiple agencies propose to approve aspects of the same project, as here, one serves as the "lead agency" that conducts environmental review for the whole of the project. In this case, the County served as the lead agency and considered the potential environmental impacts of permitting the bottling facility before it or any other public agency issued a permit for the facility. But in Appellants' view, the County's analysis was inadequate. Appellants allege that the County (1) provided a misleading description of the project, (2) defined the project's objectives in an impermissibly narrow manner, (3) improperly evaluated the project's impacts to aesthetics, air quality, climate change, noise, and hydrology, and (4) approved the project even though it would result in violations of the County's and the City's general plans.

The trial court rejected all Appellants' arguments. But we find two of Appellants' contentions have merit. First, we agree that the County defined the project's objectives in

2

an overly narrow manner. Second, we also agree that the County's process for evaluating the project's impacts to climate change was flawed. Relevant to this point, the County initially informed the public that the bottling project would result in greenhouse gas emissions of one amount, but, after the period for public comments had ended, the County disclosed that the project would actually result in emissions nearly double what it initially estimated. Under the circumstances of this case, we find that the County should have allowed the public further opportunity to comment on the project after this late disclosure. For these reasons, we reverse.

BACKGROUND

In the 1990s, Dannon Waters of North America, which later became Coca-Cola Dannon (Dannon), acquired a property in the County with the intent of constructing a bottling facility. It afterward, following County approval, constructed a bottling facility, a groundwater production well (known as DEX-6), and a domestic groundwater well (known as the domestic well). Dannon operated the plant from January 2001 until some point in 2010.

Crystal Geyser acquired the property in 2013. A few years later, after Crystal Geyser proposed returning the plant to production, the County initiated environmental review of the proposed project under CEQA. In 2017, the County released a draft document, called a draft Environmental Impact Report or draft EIR, describing the proposed project and analyzing the project's potential impacts. In the draft EIR, the County explained that, in general, "[t]he Proposed Project entails renovations to a former bottling plant in unincorporated Siskiyou County . . . adjacent to the City of Mt. Shasta (City) for the production of sparkling water, flavored water, juice beverages, and teas." It added that, to facilitate the project, Crystal Geyser would need to obtain permits from several public agencies, including, among other permits, a permit from the County for construction of a caretaker's residence for the plant, a permit from the City for wastewater discharge from the plant, and several permits from the local air quality district

3

for the plant's generators and boilers. The County evaluated in its draft EIR the potential environmental impacts associated with all these governmental approvals.

After the County circulated the draft EIR, various parties commented on the project, including Appellants. The County afterward issued a final EIR for the project with responses to these comments. A few months later, in December 2017, the County's board of supervisors certified the EIR. As part of the approval, the board acknowledged that the project would have some unavoidable significant environmental impacts but found these impacts would be outweighed by the project's benefits. (See Cal. Code. Regs., tit. 14, § 15092, subd. (b)(2)(B).[1])

A month after the County approved the project, Appellants filed a petition for writ of mandate and complaint, alleging that the County and its board violated CEQA and also violated the County's and the City's general plans. Appellants reasoned, as relevant here, that the County provided an inaccurate description of the project, defined the project's objectives in an impermissibly narrow manner, improperly evaluated several of the project's impacts, and approved the project even though it would be inconsistent with the County's and the City's general plans.

Following a hearing, the trial court rejected all Appellants' claims. The court afterward entered a judgment denying Appellants' petition for writ of mandate and complaint.

Appellants timely appealed.[2]

---

[1] California Code of Regulations, title 14, sections 15000-15387 are ordinarily referred to as the CEQA Guidelines. We will use that shorthand to refer to these regulations going forward.

[2] A few months after filing this action, Appellants also filed a related action challenging the City's issuance of a wastewater permit for the bottling facility. In that case too, the trial court rejected all Appellants' claims. Appellants afterward timely appealed the

4

DISCUSSION

### I.    CEQA Background

CEQA serves "to ensure that public agencies will consider the environmental consequences of discretionary projects they propose to carry out or approve." (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 488.)  To that end, absent an exemption, an agency proposing to carry out or approve a project generally must conduct an initial study to determine "if the project may have a significant effect on the environment." (CEQA Guidelines, § 15063, subd. (a).)  In the event multiple agencies propose to approve aspects of the same project, one serves as the "lead agency" that conducts the initial study.  (See Pub. Resources Code, § 21067 [defining "lead agency"]; see also CEQA Guidelines, §§ 15050, subd. (a), 15063, subd. (a) [noting that "the lead agency" conducts the initial study].)

Depending on the initial study's findings, the lead agency must then prepare either an EIR, a mitigated negative declaration, or a negative declaration.  If "there is no substantial evidence that the project or any of its aspects may cause a significant effect on the environment," the agency need only prepare a negative declaration that "briefly describ[es] the reasons that [the] proposed project . . . will not have a significant effect on the environment."  (CEQA Guidelines, §§ 15063, subd. (b)(2), 15371.)  If substantial evidence shows the project may in fact have a significant environmental effect, but the project applicant agrees to changes that would avoid or mitigate them, then the agency may instead prepare a mitigated negative declaration.  (CEQA Guidelines, § 15070, subd. (b).)  And if substantial evidence shows the project may have a significant environmental effect and a mitigated negative declaration is inappropriate, as is true in this case, then the agency must prepare an EIR providing detailed information about the project's potential

court's decision, which we considered in the separate case of *We Advocate Thorough Environmental Review, et al. v. City of Mount Shasta, et al.* (Case No. C091012).

5

environmental impacts.  (Pub. Resources Code, §§ 21100 [state agency requirements], 21151 [local agency requirements], 21061 [defining an EIR].)

An EIR, as courts have often said, is " ' "the heart of CEQA." ' " (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 511 (*Cleveland Nat. Forest Foundation*).)  It serves to "(1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, those impacts; (3) require project changes through alternatives or mitigation measures when feasible; and (4) disclose the government's rationale for approving a project." (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 488.)  To fulfill these purposes, an "EIR 'must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Cleveland Nat. Foundation, supra*, 3 Cal.5th at p. 511.)  But that does not mean an EIR must be exhaustive on all topics.  Courts look " 'not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' [Citation.]" (*In re Bay-Delta etc.*(2008) 43 Cal.4th 1143, 1175 (*In re Bay-Delta*).)

In reviewing an agency's compliance with CEQA, courts review for abuse of discretion.  (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512.)  Courts will find an agency abused its discretion if it either failed to proceed in a manner required by law or reached a decision not supported by substantial evidence.  (*Ibid.*)  " 'Judicial review of these two types of error differs significantly:  While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions.  In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our

task "is not to weigh conflicting evidence and determine who has the better argument." [Citation.]' [Citation.]" (*Ibid.*)

With those principles in mind, we turn to Appellants' arguments on appeal.

## II. *Project Description*

We start with Appellants' contention that the EIR had a misleading project description.

Courts have long stated that "[a]n accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 193.) Per the CEQA Guidelines, an EIR's project description must contain (1) the precise location and boundaries of the proposed project, (2) a statement of the objectives sought by the proposed project, (3) a general description of the project's technical, economic, and environmental characteristics, and (4) a statement briefly describing the intended uses of the EIR. (CEQA Guidelines, § 15124; see also *In re Bay-Delta, supra*, 43 Cal.4th at p. 1163, fn. 7 [" 'In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous.' "].) In supplying this information, a project description must account for "the entirety of the project" rather than "some smaller portion of it." (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 332.) But it should not overwhelm the public with detail " 'beyond that needed for evaluation and review of the environmental impact.' " (*Ibid*.)

In this case, the EIR's project description explained that the proposed project "consists of the operation of a bottling facility and ancillary uses within an approximately 118-acre site formerly developed and operated as a bottling plant." It explained that the proposed bottling plant would use "groundwater from the Big Springs Aquifer obtained through an existing production well (DEX-6) in the northern area of the project site to bottle three different types of beverage products: sparkling water (flavored and unflavored), teas, and juice beverages." It explained that the proposed plant would

7

initially operate one bottling line and use about "80 [gallons per minute (gpm)] on a monthly average basis (with an annualized average of 115,000 [gallons per day (gpd)])" and, over time and dependent on market conditions, could eventually operate two bottling lines and use about "150 gpm on a monthly average basis . . . (with an annualized average of 217,000 gpd)." And lastly, as relevant here, it explained that Crystal Geyser "proposes to construct a 1,188-sf caretaker/security residence within the project site" to "allow for continuous, on-site security at the Plant."

In attacking this project description, Appellants first argue that it improperly focused on the planned bottling facility rather than the caretaker's residence, even though "the *only* discretionary approval being sought from the County" concerned "the caretaker's residence." They then suggest that all the detail about the bottling facility is irrelevant, because it "is largely unrelated to the discretionary Permit that was issued by the County in conjunction with certification of the EIR." Appellants, in other words, appear to argue that the County's EIR should have focused exclusively on the caretaker's residence, and some other EIR (or EIRs) should have covered the rest of the project.

We find differently. Several agencies, it is true, had approval authority over distinct parts of the project. The County had approval authority over the building permit for the caretaker's residence, encroachments permits for "sewer system pipeline upsizing," and a building permit for a "pH [n]eutralization [s]ystem building"; the City had approval authority over a wastewater discharge permit; the regional water board had approval authority concerning the transfer and modification of waste discharge requirements; and the local air quality district had approval authority over the proposed operation of several propane generators and boilers. But nothing in CEQA required these agencies to separately evaluate their piece of the project in a separate EIR. CEQA, rather, required the opposite. It required the County, as the lead agency, to consider the "whole of the action" together, even if the project were "subject to several discretionary approvals by [distinct] governmental agencies." (CEQA Guidelines, § 15378, subds. (a)

8

[" '[p]roject' means the whole of an action"], (c) ["[t]he term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies"; it "does not mean each separate governmental approval"].)

Second, Appellants claim that the project description was inadequate because it "did not disclose to the public the fact that the County has no control over groundwater extraction or beverage bottling activities." In our reading, however, the project description made clear the limited approval authority the County had over the project. It explained that the County had permitting authority over three matters only: The construction of a caretaker's residence, the installation of additional sewer lines to accommodate greater wastewater flows, and the construction of a pH neutralization system building that could be used to treat the pH of project wastewater to acceptable limits.

Third, Appellants assert that the project description improperly offered estimates on the amount of groundwater that Crystal Geyser would extract. They acknowledge the EIR's offered estimates were based on the testimony of a Crystal Geyser employee, Richard Weklych, who has decades of experience in the bottling industry and who "provided estimates of the production levels that could be anticipated given certain equipment." But they assert that because the EIR did not impose a limit on the amount of water that Crystal Geyser could extract, any estimate on Crystal Geyser's potential water use would be speculative.

We disagree. Weklych stated that he had about 30 years of experience in the bottling industry, including as an operations manager for a bottling facility that "has similar hours of operation" as the proposed plant here. He explained that his estimates for the facility reflected the "maximum operational capacity of the plant" and that this capacity "is dictated primarily by two factors: equipment limitations and hours of operation." In terms of equipment limitations, he noted that the existing facility only

contains two production lines and that a permit would be needed to enlarge the building. And in terms of hours of operations, he noted, among other things, that his estimates already assumed that Crystal Geyser would operate the facility 24 hours a day Monday to Friday, with additional shifts on Saturday and Sunday. Based on these considerations and his experience, Weklych ultimately estimated that Crystal Geyser's average daily water demand would be 113,621 gpm for one bottling line (which the EIR appears to have rounded up to 115,000) and 216,975 gpm for two bottling lines (which the EIR appears to have rounded up to 217,000).

Considering this testimony, which appears to have gone unchallenged, we find that the EIR's offered extraction estimates were supported by substantial evidence, and not merely speculative, even if they theoretically could be exceeded. (CEQA Guidelines, § 15384, subd. (a) [" 'Substantial evidence' as used in these guidelines means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. . . ."].)

Fourth, Appellants challenge Weklych's estimates on groundwater use for two additional reasons. They first suggest that the County could not accept Weklych's estimates because he was biased in favor of his employer, Crystal Geyser. In Appellants' apparent view, an interested party's testimony cannot serve as substantial evidence on any issue. But as other courts have long explained, these types of objections are meritless. (*San Franciscans Upholding the Downtown Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656, 684 [rejecting claim that an expert's "report cannot constitute substantial evidence because, rather than providing objective analysis, [the expert] instead was a paid consultant hired by Real Parties to produce a biased, self-serving study aimed at a predetermined result"]; *Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco* (1980) 106 Cal.App.3d 893,

10

908 ["EIR [wa]s not fatally undermined by the direct participation of the developer and his experts in the underlying environmental and other studies"].)

Appellants also allege that the County could not rely on Weklych's estimates because his estimates were based on faulty assumptions about Dannon's operation of the plant. They reason that there are no "reliable records of groundwater extraction rates for the previous plant" and that the previous plant "was trucking water in from another source at the rate of 148,800 gallons per week (and not pumping all of the water for its production from DEX-6)." But Appellants, in making these assertions, ignore the material evidence that favors a contrary conclusion. Although Appellants' cited authority indicates that there are no direct records of groundwater extraction rates from Dannon, the EIR found that these rates could nonetheless be estimated using Dannon's "electrical use data, the engineering specifications of the pump in DEX-6, the depth to water, and an approximation of the working pressure in the pipelines." And although Appellants' cited authority said that Dannon trucked in water from another source, that same authority went on to note that Dannon did so only temporarily and later "did stop trucking in water . . . and began drawing all water from DEX-6."

In neglecting to disclose this important evidence that significantly undermines their position, we find that Appellants forfeited their claim that insufficient evidence supports the EIR's estimates of groundwater use. As courts have long explained, " ' "an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal." ' " (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1572 (*Pfeiffer*); see also *Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408 [an appellant "who cites and discusses only evidence in his favor fails to demonstrate any error and waives the contention that the evidence is insufficient to support the judgment."].)

Fifth, Appellants argue that "[t]he fact that [Crystal Geyser] representatives with years of experience could provide a plausible estimate of how much water could be

11

pumped . . . was beside the point. Even if the inherent limits of production line capacities, waste stream disposal, etc. were never exceeded, the Project operator could easily, and without environmental review, transport extracted ground water by truck in unlimited quantities to an off-site facility for processing and bottling elsewhere." Appellants then fault the EIR for failing to evaluate "the maximum pumping that would be allowed" under this scenario.

But nothing in the record, as far as Appellants have shown, suggests that Crystal Geyser might act as Appellants speculate. We cannot, for example, say that Crystal Geyser intends to transport groundwater to an offsite bottling facility. Nor can we say that Crystal Geyser could, even if wanted, feasibly do so—a topic that neither Appellants nor anyone else appears to have raised at the administrative level. Although, on this point, Appellants claim that "[t]rucking water to bottling locations is a practice that occurs in the water bottling industry in the area," they cite, in support, only evidence showing that Dannon temporarily trucked water from a nearby spring to its facility. But that tells us little about whether Crystal Geyser could feasibly transfer groundwater from this facility to another bottling facility. Nor does it tell us whether another bottling facility even exists anywhere near the facility here. We thus decline to find, as Appellants allege, that Crystal Geyser "could easily, and without environmental review, transport extracted ground water by truck in unlimited quantities to an off-site facility for processing and bottling elsewhere." (See *Center for Biological Diversity v. County of San Bernardino* (2016) 247 Cal.App.4th 326, 349 ["find[ing] the possibility of an extension of the term of the Project to be far too speculative to require environmental analysis at this point"]; *Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1448-1450 [rejecting the claim that a project description for a housing development should have characterized the project as involving 54 units, rather than 27, because a local ordinance allowed a second unit on each lot; "the possibility that

12

future lot owners will or will not build a second unit is extremely uncertain, and any impact of such second units is highly speculative"].)

Although Appellants counter that one case, *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, supports a ruling in their favor on this point, we are unpersuaded. The court there considered an EIR for the proposed expansion of a mining operation. Relevant here, the EIR's project description provided conflicting signals on whether the project would or would not increase mine production. On the one hand, it indicated "that no increases in mine production [was] being sought." But on the other hand, "it provide[d] for substantial increases in mine production." (*Id.* at p. 655.) The EIR, for example, indicated that the "mine would have a peak capacity of 550,000 tons per year (as mined)," but it then assumed in its evaluation of impacts that, as in previous years, "there w[ould] be production levels of only 260,000 tons per year." (*Id.* at pp. 655-656.) The court found the EIR flawed as a result of these inconsistent statements. (*Id.* at p. 656.)

Our facts, however, are readily distinguishable. Unlike in *San Joaquin Raptor*, nothing in the record here suggests that Crystal Geyser feasibly could extract substantially more groundwater than the EIR estimated. Again, the EIR's offered estimates were premised on Weklych's unchallenged testimony. And Weklych's estimates, in turn, were based on his decades of experience and his understanding of "[t]he maximum operating capacity of the plant," which, he stated, were "dictated primarily by two factors: equipment limitations and hours of operation." Considering this record, and finding nothing to support Appellants' claim that Crystal Geyser "could easily, and without environmental review, transport" water elsewhere, we cannot say that our facts are comparable to those in *San Joaquin Raptor*.

Lastly, in their discussion of the project description, Appellants raise two objections that appear to have little connection to the project description. First, they allege that the EIR "actively misled the public by including mitigation measures that the

County has no ability to enforce." Second, and relatedly, they allege that the County failed to "comply[] with CEQA's requirement that all feasible mitigation measures be adopted, and that they be enforceable." But to the extent Appellants sought to challenge the EIR's mitigation measures, they needed to raise that argument "under a separate heading or subheading summarizing the point," as required under California Rules of Court, rule 8.204(a)(1)(A). Because they failed to do so, we find they forfeited these arguments. (*Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1831, fn. 4.)

### III. Project Objectives

We turn next to Appellants' contention that the EIR's project objectives were impermissibly narrow.

An EIR's project description, as noted above, must contain a statement of the project objectives. A lead agency must then use this statement to help it, among other things, develop a reasonable range of alternatives to the proposed project to evaluate in the EIR. (CEQA Guidelines, § 15124.) As our Supreme Court has explained, "[t]he process of selecting the alternatives to be included in the EIR begins with the establishment of project objectives by the lead agency. 'A clearly written statement of objectives will help the lead agency develop a reasonable range of alternatives to evaluate in the EIR and will aid the decision makers in preparing findings. . . .' [Citation.]" (*In re Bay-Delta, supra,* 43 Cal.4th at p. 1163; see also CEQA Guidelines, § 15126.6 ["An EIR shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives."].)

Here, the EIR stated that Crystal Geyser had eight objectives for the proposed project: (1) to "operate a beverage bottling facility and ancillary uses to meet increasing market demand," (2) to "site the proposed facility at the Plant previously operated by

14

[Dannon], to take advantage of the existing building, production well, and availability and high quality of existing spring water on the property," (3) to "utilize the full production capacity of the existing Plant building based on its current size," (4) to "initiate operation of the Plant as soon as possible to meet increasing market demand," (5) to "minimize environmental impacts . . . by utilizing existing facilities and infrastructure to the extent possible," (6) to "modify the existing facilities at the Plant in a manner that incorporates sustainable building and design practices, recycling efforts, and other conservation methods, in order to reduce water use," (7) to "withdraw groundwater in a sustainable manner that does not result in negative effects on nearby springs or wells, the underlying shallow or deep aquifers, or the surrounding environment," and (8) to "create new employment opportunities for the local and nearby communities, promote sustainable economic development, provide for adequate services and infrastructure to support the project, and contribute to the County's tax base." The EIR elsewhere defined the term "Plant" to mean the "former bottling plant in unincorporated Siskiyou County."

Appellants assert, and we agree, that these objectives were "so narrow[] as to preclude any alternative other than the Project." The County largely defined the project objectives as operating the project as proposed. The project as proposed, again, "consists of the operation of a bottling facility and ancillary uses within an approximately 118-acre site formerly developed and operated as a bottling plant" in the County. And the stated project objectives, mirroring the proposed project itself, consists largely of the use of "the full production capacity of the existing Plant" and the "operation of the Plant as soon as possible." But if the principal project objective is simply pursuing the proposed project, then no alternative other than the proposed project would do. All competing reasonable alternatives would simply be defined out of consideration.

In taking this artificially narrow approach for describing the project objectives, the County ensured that the results of its alternatives analysis would be a foregone conclusion. It also, as a result, transformed the EIR's alternatives section—often

described as part of the "core of the EIR" (*In re Bay-Delta, supra*, 43 Cal.4th at p. 1162)—into an empty formality. No alternative apart from the rehabilitation of the existing plant, after all, could "site the proposed facility at the Plant," involve the use of "the full production capacity of the existing Plant," allow the "operation of the Plant as soon as possible," or involve the "modif[ication] [of] the existing facilities at the Plant." We find that the County produced a flawed EIR as a result. (See *id.* at p. 1166 ["a lead agency may not give a project's purpose an artificially narrow definition"]; see also *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 565 [" 'One of [an EIR's] major functions . . . is to ensure that *all reasonable alternatives* to proposed projects are thoroughly assessed by the responsible official.' "].)

We also find that the County's error was prejudicial. Because the County effectively described the principal project objective as operating the project as proposed, and "as soon as possible," it dismissively rejected anything other than the proposed project. In doing so, it prejudicially prevented informed decision making and public participation. (*North Coast Rivers Alliance v. Kawamura* (2015) 243 Cal.App.4th 647, 668, 671 [EIR that had a stated objective of eradicating a certain type of moth, when the underlying objective was really to protect California's native plants and agricultural crops from damage, was unreasonably narrow; it was also prejudicial because it resulted in "the EIR dismissively rejected anything that would not achieve eradication"]; see also Pub. Resources Code, § 21005, subd. (a) ["The Legislature finds and declares that it is the policy of the state that noncompliance with the information disclosure provisions of this division which precludes relevant information from being presented to the public agency, or noncompliance with substantive requirements of this division, may constitute a prejudicial abuse of discretion."].)

Apart from arguing that the County defined the project's objectives in an impermissible narrow fashion, Appellants also assert that the EIR failed to demonstrate that one of the project alternatives, the no-project alternative, was infeasible. The County

16

rejected the no-project alternative because, in its view, "[t]his alternative would not accomplish any of the basic project objectives." The County then offered three specific reasons for this conclusion, though two were largely redundant. Its three reasons were: (1) "The existing facilities within the project site would remain vacant and non-operational," (2) the "existing facilities and infrastructure" would not be used "to the extent possible," and (3) no new employment opportunities would be created in the County.

Challenging these findings, Appellants first assert that at least the first two of the County's stated reasons "lack support in the record." Appellants, in this respect, appear to challenge the County's conclusion that the existing bottling facility would remain vacant absent the proposed project. We reject their challenge. Following Dannon's closure of the plant, the facility remained vacant for several years until Crystal Geyser purchased the plant for purposes of reviving it. These facts certainly tend to show that, were Crystal Geyser to abandon the plant, it could reasonably be expected to remain vacant again for a period of time. (See CEQA Guidelines, § 15384, subd. (b) ["Substantial evidence shall include," among other things, "reasonable assumptions predicated upon facts."].)

Appellants also suggest that the County's stated reasons for rejecting the no-project alternative were not clearly tied to the stated project objectives. We find differently. That the no-project alternative would not create new employment opportunities in the County plainly related to the project objective of "creat[ing] new employment opportunities for the local and nearby communities." And that the no-project alternative would leave the existing bottling facility vacant plainly related to the project objective of "utiliz[ing] the full production capacity of the existing Plant building based on its current size."

Lastly, Appellants contend that all the County's stated reasons fail to "demonstrate[] that the no project alternative is infeasible," reasoning, it appears, that the

17

County's stated reasons are flawed because they are premised on the EIR's unreasonably narrow project objectives. We agree, as mentioned, that the offered project objectives were unreasonably narrow. We also agree that this affected the County's analysis of the no-project alternative and that the County, for this reason, will need to redo its analysis.

## IV. Impacts Analysis

We consider next Appellants' challenge to the EIR's discussion of environmental impacts. Appellants allege that the EIR fell short in its analysis of the project's impacts on aesthetics, air quality, climate change, noise, and hydrology. We address each issue in turn.

### A. Aesthetics

Appellants first challenge the EIR's analysis of aesthetic impacts. They argue that the EIR improperly assumed that the plant is not a "dominant visual feature" in the area, even though several commenters alleged otherwise. They also contend the County wrongly declined to mitigate this aesthetic impact on the ground that it is an existing condition, "despite the fact that the 'existing' situation is *in violation* of the 1998 Mitigation Agreement"—which is the agreement that Dannon and the County entered into before Dannon constructed the bottling facility.

We reject both arguments. To start, the County did not need to label the existing plant as a "dominant visual feature" simply because some individuals called it that. The County acknowledged that the plant was part of one of the "most prominent non-natural features" in the area, but it declined to find it was a "dominant" visual feature. It explained that "[d]ominant visual features are considered based on position, extent, or contrast of basic pattern elements." It then concluded that the dominant visual features here "primarily include the mountainous terrain and snowcapped mountains surrounding the City of Mt. Shasta." Although Appellants may disagree with this conclusion, finding the word "dominant" more apt than the word "prominent" when describing the plant, we find nothing unlawful in the County's choice of words. (See *Protect Niles v. City of*

18

*Fremont* (2018) 25 Cal.App.5th 1129, 1147 ["aesthetic judgments are inherently subjective"]; see also *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 626 ["Where, as here, the agency prepares an EIR, the issue is whether substantial evidence supports the agency's conclusions, not whether others might disagree with those conclusions."].)

Appellants' second argument fares no better. Although Appellants never fully flesh out their argument, they appear to believe that the County should have treated the plant building's color, a reflective white that can occasionally produce glare, as a project impact because it violates the terms of the 1998 Mitigation Agreement. As relevant here, that agreement states: "Building and free-standing signage will be constructed of non-reflective materials and will not be internally illuminated." But the County, in the EIR, declined to treat the plant's reflective paint color as a project impact for a couple reasons. First, it found that this type of argument was premised on a mistaken reading of the 1998 Mitigation Agreement. In the County's view, the mitigation measure concerning " 'non-reflective materials' " imposed "a limitation on material type (metal, glass, etc[.]), and not on paint color." Second, the County found that "[t]he plant building color is an existing condition" and so "does not constitute a project impact."

We find nothing defective in the County's reasoning. First, because Appellants offer no argument concerning the County's interpretation of the 1998 Mitigation Agreement, we find they forfeited any argument they may have had on this point. And second, because the County had the discretion to evaluate the project's potential impacts against the conditions existing at the time of the CEQA analysis, rather than the conditions existing before the construction of the bottling facility in 1998, we find no issue in its doing just that. (See *Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 321 & fn. 7 [discussing a long line of cases where "the appellate court concluded the baseline for CEQA analysis must be the 'existing physical conditions in the affected area' [citation], that is, the ' "real

19

conditions on the ground" ' [citations], rather than the level of development or activity that *could* or *should* have been present according to a plan or regulation"]; see also *Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1278-1280 [baseline for airport expansion was existing airport operations, even though the airport had a "history of illegal expansion"].)

### B. Air Quality

Appellants next, in several little explained arguments, challenge the EIR's discussion of air quality impacts.

First, they assert that, "rather than use the methodology and inputs that are the standard of the industry for air quality analysis, and rather than including *all* of the truck traffic that the Project will generate, the County manipulated the inputs, misstating the types of truck traffic as well as modifying the standard assumptions for General Heavy Industrial analyses in such a way that the conclusions fall below thresholds of significance." But Appellants never follow through to explain these allegations. They never provide the necessary background to understand their argument, neglecting, for example, to describe "the methodology and inputs that are the standard of the industry for air quality analysis." Nor do they cite the relevant parts of the EIR showing the County's alleged wrongdoing. They simply cite to a comment letter that appears to have made the same type of allegations that they raise here. Appellants, however, could not show that the County wrongly "manipulated the inputs" in the EIR simply by noting that a commenter alleged that the County wrongly "manipulated the inputs." They needed to supply reasoned argument and citations to the record and authority, not bare conclusions without explanation. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 (*Badie*) ["When an appellant . . . asserts [a point] but fails to support it with reasoned argument and citations to authority, we treat the point as waived"]; see also *City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1099 [courts " 'are not bound to develop appellants' arguments for them' "].)

20

Second, Appellants contend that "[t]he fleet mix for the DEIR analysis had also been manipulated to leave out the heaviest vehicles"; in particular, "[t]he County's air quality modeling included an intentional reduction (or even zeroing out) of heavier vehicles." But again, Appellants never follow through to support or explain their allegation. Although they show that two commenters alleged this type of conduct, they never cite the applicable parts of the draft EIR showing the alleged manipulations. All we can say based on Appellants' record citations, then, is that two commenters alleged wrongdoing. But an EIR is not flawed simply because someone said so. As this court recently explained, "[r]egardless of what is alleged, an EIR approved by a governmental agency is presumed legally adequate, and the party challenging the EIR has the burden of showing otherwise." (*Chico Advocates for a Responsible Economy v. City of Chico* (2019) 40 Cal.App.5th 839, 846.)

Third, Appellants claim that the final EIR failed to address the flaws in the draft EIR. They state: "[T]he FEIR emissions remained underestimated for CAP [an acronym Appellants never define] and GHG pollutants, and the screening-level HRA [another unexplained acronym] conducted for the DEIR was carried through *unrevised* to the FEIR, reflecting substantially underestimated health risks." They then add: "EMFAC's [another unexplained acronym] fleet mix for the Siskiyou area has been carefully calculated" and the final EIR wrongly "deviat[ed] from the standard fleet mix" without explanation when it calculated "the 103 daily truck trips . . . separately from the trips calculated in CalEEMod [another unexplained acronym] for the land use type (General Light Industrial)." But once again, Appellants fail to adequately explain or support their claims. As with their previous two arguments, they cite a comment letter that appears to allege similar types of wrongs, but they then decline to cite the relevant portions of the EIR that could support their contentions. As a result, we once again reject their undeveloped arguments. Appellants may be intimately familiar with the history of this case, the standards for evaluating air emissions, and all 55,000 plus pages of the

21

administrative record.  But we are not.  We thus require the parties before us to supply reasoned explanations for their arguments and to cite the applicable parts of the record. We also appreciate, though we do not necessarily require, when the parties explain the acronyms that they use.  Appellants, however, have fallen short in all these respects.

Fourth, Appellants challenge the County's analysis of mobile-source emissions from project operations.  Appellants assert that the County relied on a numerical threshold of significance in the draft EIR for mobile-source emissions, but then, when the final EIR revealed greater emissions than initially estimated, it abandoned its initial threshold of significance and instead said that no threshold existed.  They then contend that the County's approach was unlawful in two respects:  First, the County wrongly abandoned the threshold of significance in its draft EIR; and second, the County inappropriately attempted to analyze impacts from mobile-source emissions without using any threshold of significance.  We reject both arguments.

Starting with Appellants' first contention, we reject their claim that the draft EIR established a numerical threshold of significance for mobile-source emissions. Appellants argue otherwise based on a table in the draft EIR that discussed emissions from stationary, mobile, and area sources.  The table was divided into two parts, with stationary sources on the top and mobile and area sources on the bottom.  It estimated, for each of these three sources, the amount of emissions for certain types of pollutants and, for stationary sources, also stated the applicable thresholds of significance for the listed pollutants.  For example, the table stated that the project would emit about 274 pounds per day of carbon dioxide from stationary sources and that the threshold of significance for carbon dioxide from stationary sources is 2,500 pounds per day.  In Appellants' view, however, this table established the applicable thresholds of significance for more than just stationary sources; it also established the applicable thresholds for mobile and area sources.

22

We find differently. The table, again, was divided into two sections, with stationary source listed on the top and mobile and area sources listed on the bottom. But it only described the applicable thresholds of significance in the top section dealing with stationary sources. It noted no threshold of significance in the bottom section dealing with mobile and area sources. Other parts of the draft EIR, consistent with the table, stated that "[s]tationary source emissions of [criteria air pollutants] are considered significant if they exceed the thresholds presented in [the table]." But the draft EIR said nothing comparable about mobile-source emissions. "[T]o further clarify the applicability of the thresholds" in the table to stationary sources only, the final EIR "separate[ed] the emissions from stationary sources and mobile and area sources into two separate tables." Considering this record, we reject Appellants' claim that the referenced table established numerical thresholds of significance for mobile-source emissions.

We also reject Appellants' separate contention that the County inappropriately analyzed impacts from mobile-source emissions without using any threshold of significance. The County, in its discussion of its thresholds for determining the significance of impacts to air quality, stated that impacts to air quality would be considered significant if the project would, among other things, "[c]onflict with or obstruct implementation of the applicable air quality plan" or "[v]iolate any air quality standard or contribute substantially to an existing or projected air quality violation." The County then, applying these thresholds to the project, found that impacts from mobile-source emissions would be insignificant because they "would not conflict with any policies of the [local air district], violate any air quality standard, or contribute substantially to an existing or projected air quality violation." Appellants may not like the County's chosen thresholds for evaluating air quality impacts in this regard, but they cannot claim that the County applied no standard at all.

Lastly, Appellants assert that the County should have redone its health risk assessment—which assessed potential impacts from toxic air contaminants—after the

23

final EIR revealed an increase in air emissions. They offer two reasons in support. First, they note, the health risk assessment assumed that the project would involve 100 daily trips for "heavy-heavy duty" trucks, but the final EIR estimated a greater number of daily trips for lighter trucks and thus a greater amount of emissions. In particular, the final EIR showed 103 daily trips for heavy-heavy duty trucks and 47 additional trips for medium-heavy and light-heavy duty trucks. Second, Appellants add, the health risk assessment assumed that about two-thirds of truck traffic would come from the north of the plant and about one-third of truck traffic would come from the south, but the final EIR instead said that all truck traffic would come from the north. Because, Appellants allege, the final EIR showed a greater amount of emissions and a different location for these emissions, the County should have redone its health risk assessment to account for these changes.

We reject Appellants' argument. First, in attempting to show that the increase in estimated emissions in the final EIR warranted a revised health risk assessment, Appellants largely ignore or understate the facts supporting the County's decision not to redo the assessment. Appellants, for example, briefly note that the County's consultant concluded "that *if* the [health risk assessment] were to be re-run, it would still come out below the significance levels." But the consultant actually said that "if the [health risk assessment] were to be re-run [to account for new information], the resulting diesel emissions would be at least 30% lower. . . ." It reasoned that the health risk assessment did not account for a new state rule that "effectively requires that, beginning January 1, 2018, all heavy-duty diesel trucks operating within the State of California be equipped with either factory or retrofit diesel particulate filters." The consultant added that, if the [health risk assessment] were to be re-run to account for the modernization of the trucking fleet over time, rather than "assume that the current fleet makeup remains constant for the next 30 years," then the resulting diesel emissions would be even lower over time. For example, emissions of diesel particulate matter from heavy-heavy duty diesel trucks would be "over 85 percent lower than the 2017 rates assumed in the [health

24

risk assessment].” The consultant then explained that this detail is significant because “the health risks calculated in the [health risk assessment] are based on 20-30 years exposure.” Largely for these reasons, the consultant concluded that “no additional analysis is necessary.”

In response to all this, Appellants are generally silent. They decline to acknowledge, for example, that the health risk assessment did not account for a new state rule requiring “all heavy-duty diesel trucks operating within the State of California be equipped with either factory or retrofit diesel particulate filters.” Nor do they acknowledge that the health risk assessment did not account for the modernization of the trucking fleet over time. Nor do they acknowledge the consultant’s actual conclusions based on these considerations. Because of Appellants’ incomplete and misleading representation of the facts, we find they forfeited their argument that insufficient evidence supported the County’s decision not to redo the health risk assessment. (See *Pfeiffer, supra*, 200 Cal.App.4th at p. 1572 [“ ‘ “[A]n appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal.” ’ ”])

Appellants’ second argument concerning the location of emissions falls short too, and for a familiar reason: Appellants fail to support their claim with sufficient citations to the record. Appellants, again, claim that the health risk assessment improperly assumed that one-third of truck traffic would come from the south of the plant, even though all truck traffic would actually come from the north. But to support this claim, they cite to nothing in the health risk assessment. They instead cite to 14 pages in the record, most of which (11 pages) consists of a commenter’s resume, part of which (3 pages) consists of the commenter’s comments, and none of which supports Appellants’ position. We reject their unsupported claim as a result.

### C. Climate Change

Appellants next, for a variety of reasons, challenge the EIR's discussion and mitigation of climate change impacts.

Their first claim concerns CEQA's recirculation requirements. CEQA requires a lead agency to recirculate an EIR for public review when "significant new information" is added to the EIR after the draft EIR has been released to the public for review and before certification. (Pub. Resources Code, § 21092.1.) An EIR includes "significant new information" if, among other things, it (1) reveals "[a] new significant environmental impact [that] would result from the project," (2) reveals "[a] substantial increase in the severity of an environmental impact [that] would result unless mitigation measures are adopted that reduce the impact to a level of insignificance," or (3) shows that "[t]he draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded." (CEQA Guidelines, § 15088.5, subd. (a).)

In this case, the County initially estimated in its draft EIR that the project would result in greenhouse gas emissions of 35,486 metric tons of carbon dioxide equivalent ($MTCO_2e$) per year. Because this amount would exceed the County's established threshold of significance of 10,000 $MTCO_2e$ per year, the County concluded that the proposed project's emissions would result in a significant impact. In its final EIR, the County continued to conclude that the proposed project's emissions would result in a significant impact. But it estimated a far higher level of emissions: 61,281 $MTCO_2e$ per year. The County, however, found that this was not significant new information that required recirculation. It reasoned that because the draft EIR already found that project emissions would be significant and unavoidable even with mitigation, the final EIR's upward revision in greenhouse gas emissions did not change the EIR's ultimate conclusions.

26

Appellants contend, and we agree, that the County could not decline to recirculate the EIR under these circumstances. A lead agency could not say that greenhouse gas emissions in excess of 10,000 MTCO$_2$e per year are significant, but then, at the same time, conclude that greenhouse gas emissions over 25,000 MTCO$_2$e per year are insignificant. Yet that is what the County did here. It said that greenhouse gas emissions in excess of 10,000 MTCO$_2$e per year would result in a significant impact. But it then concluded that an increase in estimated greenhouse gas emissions of 25,795 MTCO$_2$e per year (the difference between 61,281 and 35,486) was an insignificant detail. Considering the County's own standard for determining significance, however, we hold that this finding is not supported by substantial evidence. (See *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 448 [county's decision not to recirculate was not supported by substantial evidence]; see also *Cleveland Nat. Forest Foundation, supra*, 3 Cal.5th at p. 514 ["an EIR's designation of a particular adverse environmental effect as 'significant' does not excuse the EIR's failure to reasonably describe the nature and magnitude of the adverse effect."].)

The County, its board of supervisors, and Crystal Geyser (collectively, Respondents) counter that the County's approach was appropriate because the EIR's ultimate conclusions were left unchanged—greenhouse gas emissions would remain significant and unavoidable. But that is hardly any justification at all on the facts before us. On that logic, a lead agency could conclude in a draft EIR that a project would result in the loss of one endangered animal, and that this loss would be significant and unavoidable; but it could then, in the final EIR, conclude that it is insignificant that the project would actually result in the extinction of the entire species. No matter, Respondents suggest, that the loss is magnitudes greater than disclosed in the draft EIR; it is enough that the loss remains significant and unavoidable in both the draft EIR and the final EIR. That type of approach, however, wrongly deprives the public of a meaningful opportunity to comment on a project's substantial environmental impacts. (*Laurel*

*Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1120 [recirculation is "required when the information added to the EIR changes the EIR in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project"].) It also fails to acknowledge the internal inconsistency in the lead agency finding that the loss of a single endangered animal is significant in its draft EIR, but then finding that the loss of many more endangered animals is insignificant in its final EIR. The County's decision making here suffers from these same types of fatal defects.[3]

Second, Appellants contend that the County potentially understated the amount of greenhouse gas emissions resulting from the project. Their argument concerns the County's decision not to account for the greenhouse gas emissions associated with the production of unblown bottles (called performs), which Crystal Geyser will purchase and then use for making finished bottles.

According to the County, it had no need to account for these emissions because the production of preforms would be an indirect and uncertain consequence of the project. (See *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 175 [a lead agency need not consider "an indirect and uncertain consequence" of a project]; but see CEQA Guidelines, § 15064, subd. (d) [a lead agency must consider "reasonably foreseeable indirect physical changes in the environment which may be caused by the project"].) Its reasoning was twofold. First, it stated, the demand for (and thus production of) preforms would remain the same with or without the project because, without the project, competing beverage suppliers would increase their

---

[3] At oral argument, Respondents appeared to accept that the increase in the emissions estimate was not an "insignificant detail." But because the EIR's ultimate conclusions were left unchanged—emissions would remain significant and unavoidable—they maintained that recirculation was still unnecessary. For the reasons covered, however, we find this argument unpersuasive.

own demand for preforms to "provide the necessary supply to meet the market demand for beverage products." Second, it added, although the production of preforms could change with the project if the project stimulated demand by producing enough bottled drinks to cause a significant drop in prices, that would not happen here. It reasoned that Crystal Geyser could not possibly supply enough bottled drinks, relative to the total supply of bottled drinks, to significantly impact market prices.

Challenging the County's decision, Appellants argue that the County could reasonably calculate the emissions associated with these preforms because it had estimates of "the number of bottles [Crystal Geyser] will use each year" and estimates about "the amount of $CO_2$ that is generated by the production of preforms." They then assert that "the County may not avoid the analysis of the known cumulative, global impacts associated with the identifiable number of preforms the Project will consume each year."

But in the course of making their argument, Appellants never discuss or even acknowledge the County's actual reasoning for declining to consider these emissions— which was not that it lacked information about the number of preforms that the project would use or the emissions associated with preform production, but that it was uncertain whether the production of preforms with the project would be greater than without the project. Again, the County reasoned that Crystal Geyser's competitors would have an incentive to produce more bottled drinks, and thus would likely purchase more preforms, if Crystal Geyser did not proceed with the project. Apart from ignoring the County's actual reasoning, Appellants also fail to point to any evidence supporting a necessary premise of their position. As part of their argument, they implicitly assume that each preform that Crystal Geyser purchases for the project would necessarily be a preform that would not otherwise have been produced. But because they cite nothing in the record to support this assumption, Appellants appear to rely on nothing more than speculation. For these reasons, we reject Appellants' largely unsupported and little explained claim.

Third, Appellants claim that the County wrongly assumed, without supportive evidence, that the project's heating, ventilation, and air conditioning (HVAC) system would run "two hours a day, 160 days annually." Appellants suggest that the HVAC system would likely be used more than the County estimated and then argue that the County must evaluate the greenhouse gas emissions from this additional use. But although true that the County initially assumed that the HVAC system would run only two hours a day for a period of six months, it ultimately assumed that the project's HVAC system would run "18 hours each day for a period [of] 6 months." It also explained that use of the HVAC system should be relatively limited because "the plant will include significant insulation" and be "Leadership in Energy and Environmental Design (LEED) certified." Considering these revisions, which Appellants declined to disclose, we reject their challenge to a stale set of facts.

Fourth, for several reasons, Appellants challenge the EIR's mitigation measures for the project's greenhouse gas emissions. First, they argue that the County should have reevaluated its mitigation measures when the final EIR revealed a significant increase in estimated emissions. The record, however, shows that the County both reevaluated and revised its mitigation measures in the final EIR. In any event, we find that Appellants' claim is premature at this point. Because we find the County will need to allow further public review of the EIR's discussion of greenhouse gas emissions, the County may very well be required to further reevaluate its mitigation measures in response to public comments.

Appellants also argue that the EIR's mitigation measures are not enforceable, focusing on two requirements in particular. First, they claim that part of mitigation measure 4.6-1 requires only the "possibility" of installing solar arrays, which is not meaningful mitigation. But nothing in that measure discusses solar arrays. Nor does it even use the word "possibility"—at least not on the pages Appellants cite. Second, Appellants claim that another part of this same measure requires only "a plan to establish

30

carpooling for employees," which they argue is insufficient. But again, Appellants misrepresent the record. The mitigation measure states that Crystal Geyser "shall establish and administer a carpool or rideshare program" and "shall monitor the success of the of the program for one year and submit an annual report to the County." It adds that "this measure could reduce $CO_2$e emissions by 16.5 MT of $CO_2$ annually" with 25 percent employee participation, but states that "[i]f the rideshare or carpool program does not achieve its intended goal, then [Crystal Geyser] shall subsequently purchase the corresponding number of credits from a carbon registry." The measure, then, requires a program anticipated to achieve a quantifiable reduction in greenhouse gas emissions, along with a backstop in case the program proves ineffective. It does not merely require the preparation of "a plan," as Appellants claim.

Appellants further, on the topic of enforcement, assert that "the County has no authority to enforce these mitigation measures outside of the context of [Crystal Geyser's] use of the caretaker's residence." But rather than explain this argument, Appellants direct us to look to an unspecified part of their argument "above." Reviewing Appellants' arguments "above," we understand their point to be this: Although the EIR's mitigation measures "are enforceable 'as a condition of exercise of the permit' " for the caretaker's residence, because Crystal Geyser "has no real need for the caretaker's residence, and the structure[] is not habitable as a residence, . . . 'exercising' that permit is irrelevant." Appellants, in other words, appear to believe that the County will only be able enforce the EIR's mitigation measures if Crystal Geyser decides to exercise its permit for the caretaker's residence—and that will never happen because Crystal Geyser "has no real need for the caretaker's residence, and the structure[] is not habitable as a residence."

But apart from neglecting to provide any legal authority for this conclusion, Appellants also decline to offer any evidentiary support for their claim, stating instead that the support for their claim is "noted" elsewhere in their brief. But in the end, all we

31

can find is Appellants' statement that children are not allowed to inhabit the caretaker's residence. And although that is true—one of the mitigation measures states that only employees over the age of 18 may occupy the caretaker's residence—it does not show, as Appellants claim, that Crystal Geyser "has no real need for the caretaker's residence, and the structure[] is not habitable as a residence."

Lastly, Appellants suggest that the County should have considered and adopted "other feasible measures" after it declined to require solar arrays. But the County did consider and adopt other feasible mitigation measures, including a measure requiring a carpool program, as discussed, and another measure requiring the purchase of carbon offset credits. We thus reject this claim too.

### D. Noise Impacts

Appellants next challenge the EIR's discussion of noise impacts.

They first assert that the County wrongly relied on standards developed by the Federal Interagency Committee on Noise (FICON). In support, they point to a letter from their noise consultant, who stated that "FICON thresholds . . . are out-of-date and inappropriate for industrial noise sources" and "have been superseded . . . by incremental thresholds developed by the Federal Transit Administration (FTA) for transportation noise sources." The consultant appeared to reason that FICON standards "are out-of-date and inappropriate" because the FTA standards "are more stringent."

But as the County explained in response, although the FTA standards may be more stringent, nothing in CEQA requires lead agencies to use the most stringent standards in existence when evaluating impacts. And as the County further indicated, although different experts may disagree about the best methodology for evaluating noise impacts—with the County's consultant, in this case, preferring the FICON standards and Appellants' consultant preferring the FTA standards—pointing out a " '[d]isagreement among experts does not make an EIR inadequate.' [Citation.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 409; see

also *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 642 [" 'that different methods of gathering and compiling statistics could have been employed[] is not determinative in a substantial evidence review' "].)

Second, Appellants contend that although the County should have applied the FTA standards when evaluating noise impacts, it actually would have acted inappropriately had it done so. They reason: "[A] noise expert pointed out to the County in comments on the FEIR that neither the FTA nor the FICAN thresholds are applicable to industrial noise sources. Noise from industrial sources is *not* 'broadband in nature.' It has a completely different frequency spectrum than background levels that in most cases are dominated by transportation sources." In support of this claim, they point to a part of the EIR noting that one commenter said, "Noise from industrial sources is not 'broadband in nature.' " But even it is true that "[n]oise from industrial sources is not 'broadband in nature,' " Appellants cite nothing in the record showing the relevance of that detail to their claim. We reject their undeveloped argument as a result. (*Badie, supra*, 67 Cal.App.4th at pp. 784-785.)

Third, Appellants claim that to be less than significant for CEQA purposes, project noise levels must be "inaudible to its residential neighbors throughout the day, especially during nighttime hours." In support, they cite a part of the EIR noting that one commenter said, "Any audible increase, or noise increase perceived as annoying, should be considered a significant noise impact." But nothing in CEQA requires a lead agency to adopt a noise threshold of "[a]ny audible increase" simply because one commenter suggested it. (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 884 [" 'The lead agency has substantial discretion in determining the appropriate threshold of significance to evaluate the severity of a particular impact.' "].)

Fourth, Appellants suggest that the County could not rely on "City and County noise thresholds as a standard of significance for the Project." They reason that this follows from *Berkeley Keep Jets Over the Bay Committee v. Board of Port*

33

*Com'rs* (2001) 91 Cal.App.4th 1344  and *East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281.  But neither of these cases bars lead agencies from looking to local ordinances, as the County did here, when evaluating noise impacts.  They simply, as relevant here, stand for the proposition that "a threshold of significance cannot be applied in a way that would foreclose the consideration of other substantial evidence tending to show the environmental effect to which the threshold relates might be significant."  (*Id*. at p. 303; see also *Berkeley Keep Jets Over the Bay Committee, supra*, 91 Cal.App.4th at p. 1380 [CEQA did not define "significant noise impacts simply in terms of whether a project would violate applicable local, state, or federal noise standards"].)

Fifth, Appellants claim that "the County apparently charged its noise experts to figure out a way" to undermine CEQA.  In support, citing one of their consultants, they assert:  "[T]he County arbitrarily omitted analysis of vibrational noise and decided not to analyze the combined impact of traffic and industrial noise from plant operations."  They also claim:  "The Revised Noise Analysis picks and chooses between the noise levels predicted by the FHWA [an unexplained acronym] Model and the ambient noise measurements in order to eliminate the significant and unavoidable traffic noise impacts that were contained in the Draft EIR."  But Appellants never follow through to cite any part of the EIR to support their allegations of impropriety.  We reject their unsubstantiated claim as a result.

Finally, Appellants assert that the County's "responses to comments dismissed concerns about exceedance of noise standards, claiming that a 1-4 dB exceedance is minor."  They then argue that this was improper, reasoning that "[e]ven a 1 dB increase in 24-hour levels represents a potentially significant impact to local sensitive receptors that may require mitigation."  But in making their argument about the County's "responses," Appellants never cite to the County's actual responses.  They cite instead a draft document attached to an internal County email.  One County employee emailed

another and said, "Let's discuss the printing again, etc.," and attached several documents. One of those documents was the County's sound consultant's "draft responses" to comments—which is the only document that Appellants cite to as evidence of the County's responses. Because Appellants never cite the County's actual responses to comments, but instead cite only this draft document emailed between County employees, we cannot accept their characterization of the County's responses and thus must reject their argument based on this unsupported characterization.

### E. Hydrology

Lastly, in terms of impacts, Appellants challenge the County's discussion of hydrology impacts for a variety of reasons.

Appellants first argue that the County used an improper threshold of significance for evaluating hydrology impacts. The County set forth nine different thresholds of significance for hydrology and water quality impacts. One of these thresholds, as relevant here, stated that impacts to hydrology would be considered significant if the project would "substantially deplete groundwater supplies or interfere substantially with groundwater recharge such that there would be a net deficit in aquifer volume or a lowering of the local groundwater table." In Appellants' telling, "[b]y using this standard, the County was able to accept the analysis based upon outdated models, ignore the standards of significance the Tribe attributed to the Resource, and avoid having to do any actual studies on the impacts of the proposed pumping at DEX-6 and the nearby domestic wells." Appellants add that, in using this standard, the County applied a standard "that did not analyze the water extraction increase 'in light of existing conditions' " and "did not take into account the complexity of the groundwater system and the fact that the aquifer is a Tribal Cultural Resource and that there are many local residents relying upon it for domestic water."

But Appellants never explain why all this follows from the County's chosen standard for evaluating impacts. They never explain, for example, why the County's

35

evaluation of groundwater impacts based in part on whether the project would "substantially deplete groundwater supplies" allowed the County to rely on "outdated models" and "avoid having to do any actual studies." Nor do they bother to explain the standards that the Tribe allegedly "attributed to the Resource." Nor do they show, as they allege, that the underlying aquifer is a "Tribal Cultural Resource." We reject their unexplained argument as a result. (*Badie, supra*, 67 Cal.App.4th at pp. 784-785.)

Second, Appellants contend that the County failed to consider whether project pumping of groundwater would cause short- or long-term damages to groundwater levels at nearby wells. But although they may disagree with the County's conclusions and methods, they cannot accurately claim that the County altogether failed to consider these issues. The County's hydrogeology expert, to start, provided historical data showing "static water levels" (i.e., non-pumping water levels) at DEX-6 from 2004 through 2013—which covered the last seven years that Dannon operated the well and the bottling facility. The first data point during this period, from 2004, showed a water level just under 3,577 feet. Over the next seven years during Dannon's operations, the vast majority of data points showed water levels between 3,576 and 3,577 feet. Only a few data points showed water levels below 3,576 feet—and even then, they showed levels only slightly below 3,576 feet.

The expert noted that, while this data shows limited drawdown at DEX-6 during Dannon's operation of the facility, nearby wells would have experienced even less of a drawdown during this period. It explained that "the pumping well [DEX-6] is the center of the cone of depression and as a result all other water level drawdowns at wells located at any distance radially outward from that pumping well will be less than that in the pumping well." Considering this type of information "collected over many years," the County found that "it is possible to make confident and accurate estimates of the effects of the proposed pumping on groundwater levels," as the proposed pumping would be at "rates comparable" to past rates.

36

Apart from reviewing this historical data, the County's expert also estimated the effect of Crystal Geyser's proposed pumping on water levels using a program called PUMPIT. The expert assumed in the program that the project would extract an average of 150 gpm for 365 days straight, which aligned with the EIR's statement that the project would use about "150 gpm on a monthly average basis with two production lines." Under those conditions, the expert estimated that several nearby residential wells would experience a "maximum" drawdown between 0.16 and 0.45 feet. The expert added that "drawdown impacts in nearby wells induced by pumping of wells under real-world conditions tend to be significantly less than those which have been theoretically[ ]calculated using the same model software."

Considering the County's review of historic groundwater data and its expert's modeling of the impacts from future use, we cannot find, as Appellants allege, that the County failed to consider whether "pumping at DEX-6 on the Project site causes short and/or long-term damage to groundwater levels at the many nearby off-site residential wells, City wells, and proposed City wells." Again, Appellants may not like the County's conclusions and methods, but they cannot claim that the County simply declined to consider short-and long-term impacts to groundwater levels.

Third, Appellants challenge the model that the County's expert used to evaluate potential groundwater drawdown. In their view, the expert's model was "obsolete and oversimplified." Although they never explain why they believe the model obsolete, they argue that the model was oversimplified because of "the lack of knowledge about the upper and lower aquifers." But in the course of making this argument, Appellants never describe the information that is allegedly lacking. Nor do they explain why the lack of this unspecified information undermined the accuracy of the expert's estimates. We reject their unexplained argument as a result. (*Badie, supra*, 67 Cal.App.4th at pp. 784-785.)

Fourth, Appellants suggest that the County's EIR is inadequate because no one "test[ed] at all to determine what the impacts will be to neighboring wells." But the County's expert did perform testing to determine the impacts to neighboring wells. After the expert estimated groundwater drawdown using the PUMPIT program, it further conducted a pump test at one of the two project wells. Again, the project would involve the use of two wells—one that would be used for bottling drinks (DEX-6), and another that would be used for domestic operations (the domestic well). In the pump test, the expert found it best to focus on the domestic well because, unlike DEX-6, which only extracts groundwater from the deeper aquifer system, the domestic well extracts groundwater both from the deeper aquifer system and "a 'shallower' aquifer system." As part of the pump test, the expert first measured the baseline water levels at seven nearby wells on Crystal Geyser's property. Next, the expert pumped about 247 gpm minute from the domestic well for three days straight. Finally, the expert monitored water recovery. Following the pump test, the expert observed drawdowns of 0.6 feet at the domestic well and between 0.07 and 0.3 feet at the seven nearby wells. Considering this testing, we reject Appellants claim that no one "test[ed] at all to determine what the impacts will be to neighboring wells."

Fifth, Appellants claim that the County wrongly ignored several local residents who alleged that their wells were impacted during Dannon's operation of the plant between 2001 and 2010. In Appellants' telling, the County characterized these comments as anecdotal and then moved on. But that is not an accurate characterization. The County acknowledged that some commenters claimed their pumps "burned out" or wells went dry during prior plant operations. But, for several reasons, the County explained that these assertions did not require further environmental review. First, it explained that "no well failures were reported to the County" during this period and that none of the commenters could provide, among other things, "documentation to show when such events might have occurred." For these reasons, the County found it impossible to

independently evaluate the commenters' claims. Second, the County stated that " '[b]urned out pumps' is an issue with deep pumping levels" and may occur for "mechanical reasons" that have nothing to do with water levels. Third, it stated that although a well could go dry because of low water levels, "[t]here is no evidence of any long-term or continuous decline in water levels during actual pumping of the wells for the Plant between 2001 and 2010." Finally, considering its expert's pump test and modeling of potential impacts during operation of the bottling plant, the County stated that the plant "would result in drawdowns of less than one foot in the immediate vicinity of DEX-6 and the Domestic Well, with potential drawdowns decreasing as the distance from the pumped well increased." Considering the County's extensive response, which Appellants entirely ignore, we cannot say, as Appellants allege, that the County simply "ignore[d]" the concerns of local residents.

Sixth, Appellants suggest that the County's expert offered a misleading assurance "that the groundwater extractions at the plant would not draw down nearby wells." According to Appellants, the County's expert made this assurance when explaining why well monitoring was unnecessary; but because the expert later clarified that this conclusion relied on several assumptions, "there is no guarantee at all that the prediction is correct." Appellants focus, in particular, on the expert's statement that it assumed that "the fractures in the volcanic rocks at the Domestic Well remain open, extensive and continuous in the subsurface area beneath the region; the elevations of the perforated intervals in the wells being considered are the same; and the same stratigraphic horizons in the Domestic Well have been perforated in the other wells in the region."

Appellants, however, misrepresent the record and ignore critical details. The County's expert never said that the plant "would not draw down nearby wells," as Appellants claim. It instead, at the one-page Appellants cite, said that use of the domestic well would draw down nearby wells by "less than 0.6 ft." And although the expert qualified this statement, saying it was premised on certain assumptions, Appellants have

39

not shown that these assumptions were unreasonable.  To start, two of the expert's three assumptions appear to be conservative assumptions that potentially overstated the likely level of drawdown.  The expert, again, assumed that the perforated interval elevations and the perforated stratigraphic horizons are the same in the domestic well and the nearby wells.  But the expert also explained elsewhere that wells with "screened/perforated interval elevations" similar to the domestic well would generally experience greater drawdown from operation of the domestic well.  (See *San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 25 [finding no flaw in an EIR that "relied on conservative assumptions"].)

The expert's third assumption—that "the fractures in the volcanic rocks at the Domestic Well remain open, extensive and continuous in the subsurface area beneath the region"—appears reasonable too.  On this point, the County indicated elsewhere in its EIR that the project would not alter the underlying geologic conditions.  It explained that because the project "would not substantially affect the water supply available in the aquifer," "[t]his would ensure that affects to the underlying sediment and rock would not be substantially affected by the extraction of groundwater for the Proposed Project."  And although the County acknowledged that the bottling facility is located adjacent to an active volcano and that a future eruption could certainly impact geologic conditions, it stated that Mount Shasta "is not expected to erupt for another 300 to 1,000 years." Considering the evidence in support of the expert's assumptions, which Appellants fully ignore, we see no reason to conclude that these assumptions were unreasonable.  (See CEQA Guidelines, § 15384, subd. (b) ["Substantial evidence shall include," among other things, "reasonable assumptions predicated upon facts."].)

Seventh, Appellants assert that the County's expert stated that the County need not monitor neighboring wells because "monitoring wells is 'fraught with both logistical and even legal issues.' "  They then claim that "[t]his is not a valid reason to abandon the effort of gathering the necessary data to determine impacts."  But Appellants neither

40

explain why this is so nor cite supportive authority, which is reason enough to reject their argument. (See *Badie, supra*, 67 Cal.App.4th at pp. 784-785.) Appellants also never acknowledge the whole of the expert's reasoning. True, the expert said that "monitoring is fraught with both logistical and even legal issues," including "lack of access to the well sites," "need for the wells to be shut down for extended time periods," "liability associated with the modification of those private wells and the frequent site visits by geologic personnel to obtain the data," among other things. But the expert also found that there was already a "network of existing groundwater monitoring wells" and that this network "is considered to be adequate to obtain the necessary data to monitor and evaluate long-term changes in water levels."

Finally, Appellants challenge the relevancy of the expert's pump test for two reasons. They first argue that the test was flawed because "neither the pumped well nor the observation wells are the same (or even close to) the wells of interest, which are DEX-6 . . . and residential wells to the east."

But the County reasonably addressed this type of concern in the EIR. In declining to perform a similar pump test on DEX-6, the County explained that "[l]ong-term groundwater level monitoring data collected from DEX-6 and nearby wells, including monitoring during the 10-year period of previous pumping operations by [Dannon], provides more substantial evidence regarding the effects to groundwater levels from pumping DEX-6 than a short-term pump test would achieve." The County added that its expert conducted "[a]nalytical modeling . . . to determine potential impacts from the pumping of DEX-6 and the Domestic Well on nearby residential wells" and that this modeling did not show significant impacts on nearby residential wells. Considering these responses and the record before us, we do not find that the County violated CEQA simply because it declined to run a pump test on DEX-6. As the County itself explained, "CEQA does not require a lead agency to conduct every test or perform all research, study, and experimentation recommended or demanded by commenters." (See CEQA

Guidelines, § 15204(a); see also *Cadiz Land Co., Inc. v. Rail Cycle, L.P.* (2000) 83 Cal.App.4th 74, 102 ["the County was not required to exhaust all suggested testing before EIR certification [citation], particularly since there was expert opinion indicating that further investigation was not necessary"].)

Appellants also allege that the pump test was flawed because it was too short— only three days. They reason that the record shows "no factual basis" for selecting this time period and that "the overly brief 3-day period precluded a serious examination of 4 out of 7 of the wells" that were monitored during the pump test.

But although it is true that the expert ultimately found the data from four wells useless, Appellants have not shown that this was because the pump test was too short in duration. And although true that the pump test was only three days, the County's expert explained why it believed it sufficient to conclude that "the impact to the local groundwater resources by the pumping of the Domestic Well will not be significant." First, the expert explained that the test involved a far higher average rate of pumping than would be expected under the proposed project. Under the test, again, the expert extracted 247 gpm from the domestic well; but under the proposed project, Crystal Geyser would only extract an average of 16 gpm from this well. During the three days of the pump test, then, the expert extracted more groundwater from the domestic well than Crystal Geyser would likely extract over a 45-day period.[4] Second, the expert found it significant that the test involved continuous pumping, while the proposed project would likely require only intermittent pumping. In particular, the expert stated that "the pump will likely be cycling on and off during the day as the demand is needed" and, as a result, "when the

---

[4] The expert extracted about 1,067,040 gallons of water during the test (247 gpm x 60 minutes x 24 hours x 3 days = 1,067,040 gallons). Under the proposed use of the domestic well, Crystal Geyser would reach that amount in about 46 days (16 gpm x 60 minutes x 24 hours x 46 days = 1,059,840 gallons).

42

pump is shut down, then the [static water levels] will have the ability to recover within a short time period." "Under these conditions," the expert concluded, "the impact to the local groundwater resources by the pumping of the Domestic Well will not be significant." Considering these expert findings, which Appellants never discuss or even acknowledge, we decline to find that the length of the pump test alone rendered the EIR inadequate.

> V.       *Consistency with the County and City General Plans*

Finally, we turn to Appellants' contention that the project is inconsistent with the County's and the City's general plans.

Under California law, each county and city must "adopt a comprehensive, long-term general plan" for its "physical development" and "of any land outside its boundaries which in the planning agency's judgment bears relation to its planning." (Gov. Code, § 65300.) Each county and city must then ensure that local development projects are consistent with its general plan—which means that the project, " ' "considering all its aspects, [must] further the objectives and policies of the general plan and not obstruct their attainment." ' [Citations.]" (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 153.)

According to Appellants, the project here would be inconsistent with the County's and the City's general plans. They reason that the draft EIR "found that the Project would result in noise impacts to at least one residence that conflicts with the General Plan noise standards." We reject their argument. Considering the one page in the record that they cite, Appellants appear to base their argument on the EIR's statement that, "according to the standards for determining a substantial increase in the ambient noise environment presented in Table 4.10-7, the Proposed Project would result in a substantial increase in ambient traffic noise levels along Mt. Shasta Boulevard from Ski Village Drive to Nixon Drive and CGWC Drive. The nearest sensitive receptor to CGWC Drive is located approximately 400 feet from the roadway centerline, resulting in low ambient

43

traffic noise levels at the sensitive receptor."  But the standards "presented in Table 4.10-7" are the FICON standards, not the standards in the County's and the City's general plans.  Appellants, then, have at most shown that the EIR identified a substantial increase in noise under the FICON standards, not a conflict with the applicable general plans.

## DISPOSITION

The judgment is reversed.  The trial court is instructed to enter, consistent with this opinion, a new judgment granting the petition for writ of mandate and specifying those actions the County must take to comply with CEQA.  Those actions include the need to (1) revise the statement of the project objectives, (2) revise the alternatives analysis in light of this new statement, and (3) recirculate the EIR's discussion of greenhouse gas emissions to allow comment on the new emission estimates.  Appellants are entitled to recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


\s\ ,
BLEASE, Acting P. J.


We concur:


\s\ ,
ROBIE, J.


\s\ ,
HULL, J.

44

Filed 5/12/22

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| WE ADVOCATE THROUGH ENVIRONMENTAL REVIEW et al., <br><br>     Plaintiffs and Appellants, <br><br>     v. <br><br> COUNTY OF SISKIYOU et al., <br><br>     Defendants and Respondents; <br><br> CRYSTAL GEYSER WATER COMPANY, <br><br>     Real Party in Interest and Respondent. | C090840 <br><br> (Super. Ct. No. SCCVCVPT201841) <br><br> ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |

THE COURT:

The opinion in the above-entitled matter filed April 20, 2022, was not certified for publication in the Official Reports. For good cause it appears now that the opinion should be published in the Official Reports and it is so ordered

_____

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts II, IV. A., B., D. E., and V of the Discussion.

1

EDITORIAL LISTING

APPEAL from a judgment denying a petition for writ of mandate of the Superior Court of Siskiyou County, Karen Dixon, Judge.  Reversed and remanded to the trial court with directions.

Law Offices of Donald B. Mooney, Donald B. Mooney and Marsha A. Burch for Plaintiffs and Appellants, We Advocate Through Environmental Review, and Winnemem Wintu Tribe.

Natalie E. Reed, Assistant County Counsel, Abbott & Kindermann, Inc., William W. Abbott and Glen C. Hansen for Defendants and Respondents, County of Siskiyou, et al.

White Brenner LLP, Barbara Anne Brenner and Jerry Scott Miller for Real Party in Interest and Respondent Crystal Geyser Water Company.


BY THE COURT:


\_\_\_\_\_\s\_____,
BLEASE, P.J.


\_\_\_\_\_\s\_____,
ROBIE, J.


\_\_\_\_\_\s\_____,
DUARTE, J.